JjDREW, J.
In this suit for partition, appellant Etta Piccola Lewis argues that the trial court erred in failing to recognize her as the sole owner of property which she had acquired in 1940 from a tax sale purchaser and ordering a partition in kind. The property had been purchased at a 1936 tax sale from Etta Piccola Lewis and her siblings, who had each owned an undivided interest in the property. Plaintiffs answered the appeal, seeking a partition by licitation.

FACTS

Ella Lewis owned a tract of eighty acres in Lincoln Parish. Mrs. Lewis, who died intestate in 1925, had 11 children, one of whom is appellant Etta Piccola Lewis (“Piccola”). Property taxes for 1935 were unpaid. On December 16, 1936, Eli Wilson purchased the property at a tax sale for $21.63. The tax deed was recorded on this date.
On February 12, 1940, more than three years after the tax sale, Eli Wilson, Picco-la’s brother-in-law, sold the property to Piccola for $100. She purchased the land with her separate property and retained it as her separate property. The cash sale deed recited that Piccola was to pay taxes for 1940, and that taxes for 1937-1939 had already been paid.
On August 10, 1945, Piccola and her husband executed an affidavit in California, which was where the couple moved in 1943. The affidavit stated that Piccola and her seven surviving siblings each owned an *825 undivided lk interest in the property in question. The affidavit provided:
These affiants further state that said property above described was sold at a tax sale in December, 1936, for delinquent taxes for the year 1935. That Eli Wilson became the purchaser at this tax sale. That Eli Wilson is a brother of one of the affiants, to-wit, C.A. Wilson. That the said Eli Wilson conveyed said | ¡¡property on February 12, 1940, to Pic-cola Wilson, who is one of the affiants herein. That Piccola Wilson redeemed said property from said tax sale.
Our emphasis.
The affidavit was filed into Lincoln Parish’s records on March 21,1947.

Acts of ownership by Piccola and her siblings

Piccola executed a timber deed on March 11, 1940, which was a month after she acquired the property from Wilson. In June, 1945, Piccola arid several of her siblings executed oil and gas leases on the property. In May of 1950, four of Picco-la’s siblings executed oil and .gas leases on the property. In May and June of 1984, Piccola, five of her siblings, one heir of a late sibling and Timothy Babcock executed right-of-way agreements in favor of Delhi Gas Pipeline Corporation.

How Liner acquired his ownership interest

Timothy Babcock, who was the Liners’ vendor, acquired his undivided interest in the property through the following transactions:
—April, 1983: Cash sale deed of $3,000 for Kenneth Ray Johnson’s undivided interest. Johnson is apparently the heir of Piccola’s sister Lovie Johnson.
—February, 1984: Cash sale deed of $1,200 for Norma Jean Lewis Brooks’ undivided interest in the property. Brooks is apparently an heir of Hervater Lewis, Piccola’s brother.
—February, 1984: Cash sale deed of $1,200 for Hervater Robert Lewis, Jr.’s undivided interest.
—March, 1984: Cash sale deed of $1,200 for Morice Olenta Lewis’ undivided interest. Lewis is apparently an heir of Hervater Lewis, Piccola’s brother.
—March, 1985: Cash sale deed of $5,000 for Corean Lewis Herndon’s undivided /é interest. Corean is Piccola’s sister.
Is — March, 1985: Cash sale deed of $5,000 for Hosea Lewis’s undivided /& interest. Hosea Lewis is Piccola’s brother.
Babcock ultimately acquired an undivided one-half interest in the land through these transactions.
In July of 1984, by cash sale deed, Babcock conveyed to Harry and Kitty Liner one-half of his interest in the subject property. At the time Babcock owned a \ interest. In April of 1985, by act of exchange, the Liners received Bab-cock’s remaining undivided % interest in the property. Thus, the Liners owned an undivided one-half interest in the property when they filed their petition for partition.

Procedural background

The Liners filed a petition for partition on August 24, 1998 against Piccola and three of her siblings, namely, Ludelle Lewis Newbell, Bessie Mae Lewis Barnes and Jack Green Lewis, all of whom were nonresidents of Louisiana. The Liners sought a partition by licitation. The court appointed counsel to represent the absentee defendants. Piccola soon retained her own counsel. The other defendants did not.
Trial on the merits was held on August 18, 1999. Written reasons for judgment were set forth in a ruling on November 8, 1999. Judgment was rendered on Febru *826 ary 14, 2000, the trial court decreeing that: (i) the Liners owned an undivided one-half interest in the property; (ii) the remaining one-half interest was owned in equal shares by the defendants; (iii) the Liners were entitled to a partition, but their request for partition by licitation was denied; and (iv) the .property was to be partitioned in kind. The Liners’ motion for new trial on the issue of the type of partition ordered was denied. 14The trial court reiterated that it found that the Liners did not meet their burden of proving that the property could not be conveniently divided or that a division would result in a diminution of its value or loss or inconvenience to one of its owners.

DISCUSSION

Effect of 1940 Sale

Piccola first argues on appeal that the trial court erred in not recognizing her as the sole owner of the tract by virtue of the 1940 conveyance from Eli Wilson. Pic-cola takes issue with the trial court’s conclusion in its reasons for judgment that Eli Wilson never had merchantable title to the property because he failed to file suit to quiet title. The trial court provided extensive reasons for-judgment.' However, an appeal lies from the judgment itself, not the reasons for judgment. Kirkham v. Pumphrey, 34,349 (La.App.2d Cir.12/20/00), 775 So.2d 634, writ denied, 2001-201 (La.3/30/01), 788 So.2d 1191.
Governing the sale of property for nonpayment of taxes, Article 10, § 11 of the Louisiana Constitution of 1921, as amended by Act 147 of 1932, provided, in relevant part:
The sale shall be without appraisement and the property sold shall be redeemable at any time during three years from date of recordation of the tax sale, by paying the price given, including costs and five percent penalty thereon, with interest at the rate of one percent per month until redeemed.
The above cited constitutional provision does not act as a bar to a property owner “redeeming” his property from a tax sale purchaser who is willing to convey the property after the redemption period has expired. It |fisimply sets forth when the tax sale purchaser shall permit the owner to redeem his property.
It is unclear whether the 1940 transaction may be denominated a redemption, even if its effect was essentially to serve as a redemption deed. See Holloway v. Holloway, 60 So.2d 468, 221 La. 875 (La.1952), where a quitclaim deed executed when the period for redemption had expired was not considered to be a redemption instrument. However, this does not appear to be an absolute rule, as we note that the legislature has explicitly allowed in certain circumstances a right of redemption even after the redemptive period has ended. For instance, the first paragraph of La. R.S. 47:2224 was amended by Act 175 of 1934 to provide that an owner may redeem property adjudicated to the state, even outside the three-year redemption period, “as long as the title thereto is in the state or in any of its political subdivisions, or if not heretofore contracted to be sold by such subdivisions!.]” See also La. R.S. 47:2262.
There is no question that a co-owner’s purchase from a tax sale adjudica-tee during the redemption period inures to the benefit of the remaining co-owners. See Boase v. Edmonson, 471 So.2d 847 (La.App. 2d Cir.1985), where this court ruled that the co-owner presumptively redeemed the property for the benefit of all her co-owners. The issue before this court is whether, and under what circumstances, a sale to a co-owner from the tax purchas *827 er after the redemption period inures to the benefit of the other co-owners.
In British American Oil Producing Company v. Grizzaffi, 135 So.2d 559 (La. App. 1st Cir.1961), the property at issue was sold at a June 24, |fi1911 tax sale. On January 9, 1913, the tax sale purchaser conveyed the property to a original co-owner of the land. At the time of the tax sale and the subsequent sale to the co-owner, the period of redemption was one year. See Article 233 of the 1898 Constitution. This same period was retained in Article 233 of the 1913 Constitution. The court held that the “purchase of one co-owner of the interest of another [co-owner ] from the adjudicatee thereof at a tax sale, operates only as a tax redemption thereof for the benefit of all owners in common.” Our emphasis. British American Oil Producing Company v. Grizzaffi, 135 So.2d at 565.
In Jones v. Jones, 121 So.2d 734, 240 La. 174 (La.1960), the supreme court discussed the “equitable doctrine that where a co-owner of property purchases the property at a tax sale, the purchase inures to the benefit of all of the co-owners and does not operate to divest the other co-owners of their interests[.]” Id., 121 So.2d at 735. In Jones, a co-owner acquired the property from the tax sale purchaser after the period of redemption had expired. Although it implicitly recognized that the equitable doctrine may apply to instances when the co-owner purchased the property after the redemption period, the court nonetheless held it did not apply to the particular circumstances of that case. The court stated:
In the instant case there is no evidence of any collusion or fraud. The tax purchaser was not the agent or representative of any of the co-owners. He was not an interposed party. He sold the property after the expiration of the period of redemption at its fair market value to one of the former co-owners, who was not in possession of the property at the time the taxes were due and was not in a position of trust with respect to her former co-owners.3
The court added in footnote 3:
j7There is a dispute over whether the ■ defendant in purchasing this property from Blanche did so with the intention of acquiring it as a ‘homestead’ for her family or whether as the district judge found she ‘had nothing other, in view than becoming the sole owner of this property, though because of her expressed love for her brothers and sisters and a sentimental feeling in regard to the property, she wanted it always to be a home to which they would be welcome.’ From our review of the record, we cannot say that the district judge erred in resolving this question in favor of defendant.
Id., 121 So.2d at 736.
Whether denominated as a redemption or as a conveyance under the equitable doctrine outlined in Jones, supra, it is clear that under some circumstances a purchase by a co-owner from a third-party tax sale adjudicatee outside the redemption period will inure to the benefit of the other co-owners and provide a redemptive effect. Such circumstances exist in this case.
Eli Wilson was the brother-in-law of Pic-cola, which presents the possibility that he was acting as a representative of Piccola when he purchased the land at the tax sale. The stated consideration for the 1940 conveyance to Piccola was $100. Taxes due for 1935 were $16.88, and Wilson also paid costs of $4.75. Moreover, Wilson paid taxes for 1935-1939. Assuming that the taxes remained constant during this period, Wilson would have paid a total of $84.40 in taxes. We further note *828 that Piccola purchased the tract as her separate property. While Piccola alone executed a timber deed in 1940, her siblings would later act as co-owners without the objection of Piccola. She along with several of her siblings executed oil and gas leases on the property in 1945. Four siblings would later grant oil and gas leases in 1950. In 1984, Piccola, several siblings and | «Babcock executed right-of-way agreements in favor of Delhi Gas Pipeline Corporation.
Most significant of Piccola’s subsequent actions is the affidavit drafted in 1945 by Piccola and her husband. Piccola put to rest any doubts about what she intended to accomplish when purchasing the property from her brother-in-law by stating in the affidavit that she “redeemed”the property. The 1940 purchase clearly inured to the benefit of all the co-owners at the time of the 1935 tax sale. It effectively made Piccola and her siblings each owners of an undivided jé interest in the property by returning them to the status quo prior to the tax sale.

Affidavit

Piccola next argues that the trial court erred in finding the 1945 affidavit to be a genuine affidavit of Piccola and her husband. She concedes that the affidavit is an ancient document under La. R.S. 13:3729. There is a prima facie presumption of the execution and genuineness of an ancient document. La. R.S. 13:3730. Pic-cola attempted to rebut this presumption through the testimony of her daughter Lo-vie Wilson Lee. Piccola, who was 100 years old at the time of trial and living in California, did not testify.
Lee disputed that her parents’ signatures were on the affidavit. She also contended that her parents’ names were misspelled on the affidavit. She argued that her mother’s name was not spelled “Peco-la” and her father’s name was not spelled “Charles” as written and signed on the affidavit. Her father went by the name “Charley.”
We note that at some places in the text of the affidavit, appellant’s name is spelled “Pecóla.” In other places in the affidavit it is spelled | a“Piccola”, most notably in the sentence referring to redemption of the property. We also note that Piccola’s name is spelled “Pecóla” and that she signed her name “Pecóla” on the 1984 right-of-way agreement. ■ Lee admitted that it was her mother’s signature on that agreement. We further note that Piccola’s name is spelled “Pecóla” on the 1945 mineral lease. The trial court compared the signatures on the affidavit with the signatures on the 1940 conveyance from Wilson, the 1945 mineral lease and the right-of-way agreement, and found that the signatures appeared to be the same.
Lee’s testimony failed to rebut the presumption of the execution and genuineness of the affidavit. The trial court did not err in accepting the affidavit as genuine.

Acquisitive Prescription

Piccola next argues that the trial court erred in failing to find that she acquired complete ownership of the tract through acquisitive prescription of ten years or thirty years. Acquisitive prescription of ten years requires possession of ten years, good faith, just title and a thing susceptible of acquisition by prescription. La. C.C. art. 3475. For purposes of acquisitive prescription, a possessor is in good faith when he reasonably believes, in light of objective considerations, that he is owner of the thing he possesses. La. C.C. art. 3480. Good faith is presumed; this presumption is rebutted on proof' that the possessor knows, or should know, that he is not owner of the thing he possesses. La. C.C. art. 3481. We agree with the trial court that the *829 element of good faith was absent due to Piccola’s statements in her affidavit that she redeemed the property for her siblings and that they each|inowned an undivided $ interest. Piccola did not acquire the property through acquisitive prescription of ten years.
We must next determine whether Piccola acquired the rights of her co-owners through thirty years acquisitive prescription. Ownership and other real rights in immovables may be acquired by the prescription of thirty years without the need of just title or possession in good faith. La. C.C. art. 3486.
A co-owner, or his universal successor, may commence to prescribe when he demonstrates by overt and unambiguous acts sufficient to give notice to his co-owner that he intends to possess the property for himself. La. C.C. art. 3478. Regarding possession by a co-owner, this court has stated:
The well-settled jurisprudential general rule is that an owner in indivisión cannot acquire by prescription the rights of his co-owners in the property held in common. Possession by one co-owner is generally considered as being exercised on behalf of all co-owners. It is equally well settled that an exception to the general rule is recognized in those instances where the possessing co-owner gives notice to the other co-owners that he intends to possess as owner adversely and contrary to the common interest. Under such circumstances, one. owner in common may prescribe against a co-owner provided such possession be clearly hostile and notice be given thereof. Givens v. Givens, 273 So.2d 863 (La.App. 2d Cir.1973).
Franks Petroleum, Inc. v. Babineaux, 446 So.2d 862 (La.App. 2d Cir.1984).
Even if we assume that the 1940 conveyance was sufficient to give notice that Pic-cola intended to possess the property for herself, possession would have been'interrupted when the siblings executed mineral leases in |n!945. That was also the year that Piccola executed the affidavit which at the very least indicated she was not possessing the property for herself.
Piccola paid taxes on the property, but this, in and of itself, was not sufficient to provide the requisite notice. It has been held that mere occupancy, use, payment of taxes and similar acts of possession will not suffice to constitute notice of adverse possession to an owner in common. Boose v. Edmonson, supra. However, when a co-owner possesses under -a recorded instrument apparently conveying title (even though the purported conveyance is invalid), the recorded instrument, together with the acts of possession, constitutes notice to other co-owners and the possession is then regarded as hostile to the interests of the other co-owners, rebutting the presumption that possession is for the benefit of all co-owners. Franks Petroleum, Inc. v. Babineaux, supra. Nonetheless, once Piccola executed the affidavit acknowledging the co-ownership, any impact the recorded instrument had in elevating the notice level of merely paying taxes quickly disappeared.
■ Lee testified that her mother sold timber from the property in 1966, although there is no documentary proof of. this. Even if we assume the existence of such a timber deed, and further assume that this deed provided notice of adverse possession, this possession would-have been interrupted 19 years later when the right-of-way agreements were executed in 1984- by Piccola, several of her siblings and Bab-cock. Babcock, who was originally interested in the property for recreational purposes, built hunting stands on the property when he began purchasing the co-owners’ *830 interests in 1983, although these stands were torn, down by neighboring landowners who used |1Pthe property for hunting. When Babcock first went on the property, he found an old road, fences with trees growing through them and shrubbery which indicated that homes had once been there.
We note that Piccola filed suit against Babcock in 1985 to remove his cloud from her title; however, no action has been taken in that lawsuit since 1992. We additionally note that Piccola never took any sort of legal action against any of her siblings regarding their actions in signing mineral leases and right-of-way agreements encumbering the property.
Piccola’s contentions are without merit. She did not acquire the property through either ten or thirty years acquisitive prescription.
Estoppel
In her final assignment of error, Piccola urges that the trial court erred in denying her plea of estoppel, citing Harrell v. Harrell, 142 So. 138, 174 La. 957 (La.1932) for support. That case can be readily distinguished as Piccola has not transferred the property to a third-party, unlike the defendant co-owner in that case. In addition, Piccola executed the affidavit in which she admitted that she redeemed the property on behalf of her siblings and outlined their ownership interests. This assignment of error is without merit.

Partition

The Liners answer the appeal, averring that the trial court erred in ordering a partition in kind and denying a partition by licitation. A partition in kind shall be ordered when the thing held in indivisión is susceptible to division into as many lots of nearly equal value as there are shares and the aggregate value of all lots is not significantly lower than the value of the 1 ^property in the state of indivi-sión. La. C.C. art. 810. When the thing held in indivisión is not susceptible to partition in kind, the court shall decree a partition by licitation or by private sale. La. C.C. art. 811. When one of the co-owners is an absentee, the partition may be effected by licitation, whether the property is divisible in kind or not. La. C.C.P. art. 4621. Except as otherwise provided by law, or unless the property is indivisible by nature or cannot conveniently be divided, the court shall order the partition to be made in kind. La. C.C.P. art. 4606. Whether land should be divided in kind or by licitation is a question of fact to be decided by the trial court. Green v. Small, 79 So.2d 497, 227 La. 401 (1955); Connolly v. Nevils, 97-569 (La.App.2d Cir.10/29/97), 702 So.2d 1043.
In Tri-State Concrete Co., Inc. v. Stephens, 406 So.2d 205 (La.1981), the supreme court discussed the differences between a partition in kind and a partition by licitation:
The general rule is that partition in kind is favored over partition by licitation. Unless the property is indivisible by nature or cannot conveniently be divided, the court shall order the partition to be made in kind. Property cannot be conveniently divided when a diminution of its value, or loss or inconvenience of one of the owners, would be the consequence of dividing it. The burden of proof is on the party seeking partition by licitation to prove that the property cannot be divided in kind.
In order to affect a partition in kind, the property must be divided into lots of equal or nearly equal value. It is the function of experts to form the lots which thereafter must be drawn by chance, and not selected, by the co-owners. It is not within the power or province of the judge or the experts to sug *831 gest that a certain part or parts of the property be set apart or allocated to one of the co-owners. There must be as many lots as there are shares or roots involved.
Id., 406 So.2d at 207-208. Citations omitted.
luBabcock, who was accepted as an expert in real estate appraisal, testified that the property was composed of timber in the southeast portion, a low boggy area in the northwest corner and a creek running diagonally through the property. He described the property as containing low areas that are usually wet and damp, high lands with hardwood and pine timber, creek beds and no improvements in terms of structures. Babcock believed that the southern 40 acres were more valuable than the northern 40 acres. He felt that the best value of the property was to use it for recreation such as hunting.
Babcock did not think the property could be divided into tracts of equal size and value, although the property could be divided into tracts of equal value, probably dividing it up into one tract of 20 acres and the other tract of 60 acres. Babcock testified:
Q: Would it be — although I know it may not be easy but would it be relatively easy to draw a line basically cutting this eighty acre tract into and giving equal value to both tracts?
A: It can be done.
Q: Okay.
A: But I don’t think you can do it and both get forty acres.
Q: Okay. But—
A: It can be done that they have equal values.
Babcock was then asked if he could divide the property into tracts of equal value with each tract having some characteristics of the high ground, low ground and flood hazard area:
Q: Okay. So you’re saying twenty across here and sixty elsewhere. Would it be feasible to draw a line and divide this eighty acre tract into two pieces where the hard land is roughly divided and the high ground or the higher ground would be divided as well so that would get an element of all of these different—
11 rA: Yes.
Q: different variables in the properties. So it would be able — feasible to draw a line where you could divide these three elements and give them two equal values in the property?
A: Uh-huh.
Q: Okay. How would you go about doing that? Would you get somebody like as yourself would appraise the property and the different elements and then—
A: This is a picture taken off of a FEMA flood map.
Q: Uh-huh.
A: The accuracy of it is, you know, ten to twenty percent. It would require a surveyor to go through that and actually take maybe a ten or twenty foot elevations on it to see where those elevations are because this would look like stripes through here if you were doing that right because it does fall off drastic before the creek and have somebody do that and then with the technology that’s available now, it could be done by a surveyor. I mean would be very expensive but it can be done.
[[Image here]]
Q: Okay. What would be your estimated cost of something in that nature as far as the survey and dividing it in two—
*832 A: I think topography works about a hundred dollars an acre. About eight thousand dollars.
Our emphasis.
Babcock is apparently saying it would be expensive to divide the property into tracts of equal value that share physical features, not that it would be expensive to only divide the property into tracts of equal value. His testimony was clarified when he was later questioned by the court:
The Court: Mr. Babcock, is what you are saying is that it could be divided in kind but it would be expensive?
The witness: Expensive, yes.
The Court: All right. But it is possible to divide it in kind to where each would get equal value?
The witness: Well it’s relatively easy to do equal value but to do equal quantity — forty acres apiece would not be easy.
The Court: Right. But you could do it—
The witness: I could do it — I could do the value easy, but I could not do the—
|1fiThe Court: Okay, I understand.
Our emphasis.
Harry Liner testified that he had walked over the entire property. He couldn’t drive on the property because of the deep ravine of the creek and the timber. He built a bridge across the creek so he could use both sides of the property for hunting. Liner described the property as land-locked.
The evidence did not show that the property could not be conveniently divided. The Liners failed to carry their burden of proof on this issue. Based on our review of the record, we cannot find that the trial court was clearly wrong in ordering a partition in kind.

DECREE

The judgment is AFFIRMED with each party to bear their own costs.
APPLICATION FOR REHEARING
Before BROWN, WILLIAMS, CARAWAY, KOSTELKA, and DREW, JJ.
Rehearing denied.
BROWN, J., would grant rehearing.